**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**RAYMOND F. HEDGER, II,**

      **Plaintiff,**

                                   **Civil Action 2:10-cv-1026**
      **v.**                            **JUDGE GREGORY L. FROST**
                                   **Magistrate Judge E.A. Preston Deavers**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Raymond F. Hedger, II, brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying his applications for social security disability insurance benefits and

supplemental security income. This matter is before the United State Magistrate Judge for a

Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 16), the

Commissioner's Memorandum in Opposition (ECF No. 21), and the administrative record (ECF

No. 9). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE**

Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff filed his applications for benefits on January 10, 2007, alleging that he has been

disabled since June 30, 2004, at age 37. Plaintiff alleges disability as a result of Post-Traumatic

Stress Disorder ("PTSD"), depression, high blood pressure, a Baker's cyst, high cholesterol,

back injury, medial meniscus tear, twisted pelvis, acid reflux, alcoholism, drug addiction, and

migraines.  (R. at 155.)  Plaintiff's application was denied initially and upon reconsideration.

Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ").

The ALJ, Richard D. Brady, held a hearing on January 12, 2009, at which Plaintiff,

represented by counsel, appeared and testified.  (R. at 32-55, 57-60.)  A vocational expert also

appeared and testified.  (R. at 55-67.)  On April 1, 2009, the ALJ issued a decision finding that

Plaintiff was not disabled.  (R at 8-26.)  The ALJ's decision became final and appealable in

October 2010, when the Appeals Council denied Plaintiff's request for review.  (R. at 1-3.)

Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

According to Plaintiff, he is disabled due to anxiety, nervousness, and depression.  (R. at

41.)  Plaintiff treats with a therapist and a psychiatrist once a month.  (R. at 42.)  He testified that

his medications, Zyprexa and Citalopram, have not helped him much and that he continues to

experience "a lot of nervousness, anxiety, and depression."  (R. at 43.)

Plaintiff lives with his girlfriend, her child, and her elderly mother.  (R. at 37.)  He

testified that he mostly just stayed at home and that he did not like being around people.  (R. at

54.)  Plaintiff does not have a driver's license because it was suspended due to a DUI charge, but

his license is now eligible for reinstatement. (R. at 33.)  He went through an alcohol

detoxification program in either 2006 or 2007.  (R. at 38-39.)  He testified that since

detoxification, he drinks "[m]aybe a sixpack . . . occasionally," and that he is able to control

what he drinks.  (R. at 40.)  Plaintiff also testified that he attends AA meetings, but "[n]ot as

regularly as [he] should." (R. at 40.) He explained that his attendance is "sporadic" since he does not have a driver's license. (R. at 40.)

Plaintiff previously worked as a coordinator at a facility that provided services to clients with mental retardation and developmental disabilities. (R. at 34.) He indicted that he left that job because his employer added too many responsibilities. (*Id.*) Plaintiff also previously worked as a laborer at a wood fabricating plant and at a cable manufacturer. His responsibilities included using saws, drills, and lathes. (R. at 35.) He worked with a small crew of people and enjoyed his job at the cable manufacturer. (R. at 54.) Plaintiff testified that he left his last job at the cable manufacturer in 2004 after witnessing the death of a co-worker at the plant. (R. at 36.)

In the two to three years prior to the hearing, Plaintiff performed some side jobs such as cleaning out gutters and interior painting. (R. at 43-44.) He also began working with his friend on kitchens and countertops, but that job did not work out due to personality differences. (R. at 45-46.) In the past, he has been fired from or has quit employment due to his temper. (R. at 47.) Plaintiff has had difficulty getting along with supervisors. (R. at 47-48.) He testified that he enjoyed his previous jobs, but that they "got to be too much." (R. at 53.) He indicated that if he had a job similar to his old one and could handle the physical expectations, he could mentally handle it so long as he understood what needed to be done. (R. at 49.)

## B. The Vocational Expert's Testimony

The ALJ first asked the vocational expert ("VE"), Larry Ostrowski, to consider a person who was mentally limited to performing jobs involving: simple, unskilled, one-to-three step tasks; working with co-workers in small groups; no direct contact with the public; and no fast production rate pace work. (R. at 62-64.) Based on this hypothetical, the VE testified that such

an individual could not perform Plaintiff's past relevant work.  (R. at 62.)  That individual could,

however, perform medium, unskilled jobs, such as a equipment cleaner, with 168 jobs in the

regional economy and 200,124 nationally; or hand packer, with about 45 jobs in the region, and

109,905 jobs nationally.  (R. at 63.)  Another job the hypothetical individual could perform

would be order filler, with 32 such jobs in the local region, and 56,702 jobs nationally.  (*Id.*)  The

VE also testified to light jobs that the individual could perform, such as price marker, with 105

jobs in the region, and 184,281 nationally; business mail clerk, with 33 jobs in the region, and

82,240 nationally; packer/inspector, with 88 regional jobs and 250,214 national jobs.  (*Id.*)

If that same hypothetical individual was off task more than ten percent of the time due to

symptoms such as anger or concentration laps, the individual would be unable to sustain

employment.  (R. at 64.)  The VE testified that the added limitation of needing to seek treatment

twice per month for medical reasons may diminish the numbers of jobs, but generally would not

be a problem because employers are likely to accommodate this limitation.

### III.    MEDICAL RECORDS[1]

### A.    Tri-County Help Center

Plaintiff began mental health treatment at Tri-County Help Center ("Tri-County") on

September 21, 2006, after referral from his alcohol abuse counselor.  (R. at 248-58.)  Initially,

Plaintiff complained of being easily distracted, having sporadic mood swings, and having

occasional sleep problems.  He stated that he attended counseling for "nothing really," indicating

---

[1]At the hearing, Plaintiff's counsel advised that the claim is based on Plaintiff's mental
impairments. (R. at 30-31.)  Consistently, Plaintiff's Statement of Errors concerns only his
mental impairments.  Accordingly, the Court will focus its review of the medical evidence on
Plaintiff's alleged mental impairments.

that a court had originally ordered the counseling in 1999.  Plaintiff reported that he had been

sober for six years, but had relapsed in July 2005.  He commented that alcohol causes most of

the depression he experiences.  (R. at 251.)  He discussed the death of his co-worker at his last

full-time job and also the death of his mother by suicide in 1980.  (R. at 248, 250.)  The intake

counselor at Tri-County, Leigh Huggins, L.I.S.W., M.S.W., noted that Plaintiff appeared to be

moderately anxious with a dysthymic mood.  She reported also that he appeared to be of average

intelligence and that he was adequately groomed.  (R. at 255.)  Ms. Huggins diagnosed Plaintiff

with PTSD, alcohol dependence, and dysthymic disorder.  She assigned Plaintiff a Global

Assessment of Functioning ("GAF") score of 45.[2]  (R. at 257.)

     After this initial evaluation, Plaintiff failed to show for scheduled appointments.  He next

returned to Tri-County in March 2007.  (R. at 357-59, 361.)  In March 2007, Plaintiff reported

relapsing into alcohol abuse, continued flashbacks, ongoing mood swings, and multiple

depressive symptoms.  (R. at  245-47, 259-60.)  On June 6, 2007, Plaintiff again reported

struggling with anger, irritability, and flashbacks.  He noted that he had been unable to tolerate

any engagement in hobbies or helping his friends.  He also indicated that he was still actively

using alcohol.  (R. at 350.)  He reported that his Elavil and Xanax medication had no effect and

that he could not afford the Wellbutrin his doctor had prescribed.  (R. at 350-51.)

---

[2]The GAF scale is used to report a clinician's judgment of an individual's overall level of
functioning. Clinicians select a specific GAF score within the ten-point range by evaluating
whether the individual is functioning at the higher or lower end of the range.  A GAF score of
41–50 is indicative of "serious symptoms . . . or serious impairment in occupational, social, or
school functioning."  *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of
Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-
TR).

On July 19, 2007, Plaintiff reported that he continued to use alcohol, but that he was not using it as much.  Plaintiff also reported that although he had been avoiding certain family members due to his anger issues, he had experienced positive interactions with his father and planned to attend a family gathering.  (R. at  348-49.)

On October 30, 2007, psychiatrist Maura Andronic, M.D., evaluated Plaintiff.  She noted that Plaintiff appeared moderately depressed and anxious with mild anger and irritability.  Plaintiff reported depression and alcohol use.  He stated that he had been sober for six years, but after his co-worker was killed, he started using marijuana, pain pills, and alcohol.  Plaintiff also reported that he could usually control his temper if he was not drinking.  Dr. Andronic found that Plaintiff's speech was clear and that his thought processes were logical.  She diagnosed Plaintiff with a mood disorder not otherwise specified and alcohol, pain medication, and marijuana dependence in early remission.  She assigned Plaintiff a GAF score of 40[3].  She prescribed the medication Seroquel and recommended that Plaintiff attend and AA meetings.

On December 10, 2007, Plaintiff reported to Dr. Andronic that he had not been drinking since October 14, 2007.  He indicated that stopping drinking had improved his mood.  He also stated that he had noticed fewer episodes of "talking and fighting" in his sleep since starting Seroquel and that his temper had improved, though he was still short-tempered.  He indicated that his mood was better, especially since he was not drinking.  Dr. Andronic noted that

_____

[3]A GAF of 31 - 40 indicates "Some impairment in reality testing, or impairment in speech and communication, or serious impairment in several of the following: occupational or school functioning, interpersonal relationships, judgment, thinking, or mood." DSM-IV-TR at 32-34.

Plaintiff's mood and affect were not as depressed and that his thought processes were logical and coherent. (R. at 332-33.)

On January 16, 2008, a Tri-County nurse noted that Plaintiff had remained sober. Plaintiff reported continued irritability and flashbacks of past trauma. On May 6, 2008, Plaintiff reported that he was abusing alcohol, which apparently had increased his irritability and temper problems. (R. at 433.)

On April 1, 2008, Plaintiff reported to Dr. Andronic that Seroquel made him too groggy and increased his feelings of irritability. She started Plaintiff on Zyprexa, another antipsychotic medication. (R. at 410-11.) On June 11, 2008, Plaintiff reported that his mood was a little better such that he had more patience with his step-daughter and was able to control his anger. He also reported that his depression had improved. Dr. Andronic increased his Zyprexa dosage. (R. at 403-05.)

In August 2008, Ms. Huggins completed a mental function capacity assessment for Job and Family Services. She concluded that Plaintiff had marked limitations in his ability to maintain attention and concentration; his ability to perform within a schedule and maintain regular attendance and punctuality; his ability to work in coordination with and proximity to others; his ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to work at a consistent pace without an unreasonable number and length of rest periods; his ability to interact with the public; his ability to accept instructions and respond to criticism from supervisors; his ability to get along with co-workers without distracting them or exhibiting behavioral extremes; his ability to maintain socially appropriate behavior; and his ability to respond appropriately to changes in a work setting. Ms.

Huggins concluded that Plaintiff was unemployable and would remain so for twelve months or more. (R. at 440.)

On September 10, 2008, Plaintiff reported to Dr. Andronic that he had difficulty with racing thoughts and anxiety after running out of Zyprexa. He also reported that he had attended a family cook-out the previous weekend and had handled it better than expected. Dr. Andronic diagnosed Plaintiff with a mood disorder not otherwise specified; rule out bipolar disorder; and alcohol, pain medication, and cannabis dependence. (R. at 438-39.)

When Plaintiff saw Ms. Huggins on September 30, 2008, he noted that he had not experienced as many explosive incidents, although he was using avoidance rather than new skills at negotiation and tolerance for the behavior of others outside of his immediate family. (R. at 427-28.)

On November 13, 2008, Plaintiff reported decreased delusional thoughts, but stated that he had run out of Zyprexa for three days, which had increased his racing thoughts and difficulty being around people. He stated that he had fewer mood swings, slept better with Zyprexa, and was maintaining sobriety. (R. at 435.)

**B.       David Bousquet, M.Ed.**

Consulting psychologist David Bousquet, M.Ed., examined Plaintiff on May 30, 2007. (R. at 276-82.) Mr. Bousquet noted that Plaintiff was "cooperative during the evaluation process but did tend to be anxious, restless and fidgety." (R. at  278.) Mr. Bousquet also noted that Plaintiff has tried to commit suicide twice in the past.

Plaintiff reported having many significant problems relating within his family when growing up. His mother committed suicide when Plaintiff was age 13. He also reported a family

history of psychological problems and substance abuse.  At the time of the evaluation, Plaintiff

was involved with behavioral health treatment and also outpatient treatment for substance abuse.

Plaintiff further reported that he "will use alcohol, 'whenever [he] can get it.'"  (*Id.*)  The amount

of alcohol that he drank tended to vary.  He also continued to use marijuana.  Plaintiff described

a history of blackouts and withdrawal symptoms from substance abuse.  Plaintiff also described

difficulties relating with others when working.  He reported tendencies to drink before work and

also at lunchtime.  He indicated that previous employers had fired him for these behaviors.

Mr. Bousquet concluded that Plaintiff meets the diagnostic criteria for chronic PTSD and

major depressive disorder, recurrent.  He assigned Plaintiff a GAF of 50.  (*Id.*)  Mr. Bousquet

opined that Plaintiff's ability to relate to others, including co-workers and supervisors, and his

ability to maintain adequate persistence and pace were moderately impaired.  (R. at 281-82.)

Mr. Bousquet also opined that Plaintiff's ability to understand, remember, and follow

simple/basic instructions and/or directions was not impaired, but his ability to understand,

follow, and remember detailed/complex instructions was mildly impaired, primarily because of

his level of depression and anxiety.  Mr. Bousquet found that Plaintiff's ability to maintain

attention and concentration in order to perform simple repetitive tasks was not impaired.  He

opined, however, that Plaintiff's ability to maintain an adequate persistence and pace from an

emotional and psychological perspective was moderately impaired based upon Plaintiff's

description of consistent problems with energy and motivation.  He further opined that Plaintiff's

ability to deal with the stress and pressures associated with daily work activities effectively and

adaptively was markedly impaired, as the findings suggested that the under the conditions of

stress and pressure, Plaintiff would likely experience an exacerbation of his psychological

problems and would tend to increase his use of substances. (*Id.*)

**C.      Vic Cerra, Ed.D.**

On August 13, 2008, Plaintiff was evaluated by Vic Cerra, Ed.D., on behalf of Belmont

County Department of Job and Family Services. (R. at 366-76.) During the evaluation, Plaintiff

reported continued drinking, but denied use of marijuana or pain medications. He also reported

rapid mood swings and frequent flashbacks of prior trauma. Plaintiff indicated that he had a

history of difficulty controlling his anger and engaged in angry outbursts. Plaintiff did note

however, that he was controlling his anger much better since taking medication. Plaintiff also

reported having auditory hallucinations of hearing a bell ringing and/or hearing a voice talking to

him. He further reported paranoid thoughts of people staring at him and stated that he was

uncomfortable in large crowds. He stated that he experienced two panic attacks per month. He

reported experiencing racing thoughts, increased energy, and impulsive acts during manic

episodes and social isolation, decreased energy, and motivation and feelings of helplessness and

hopelessness during depressive episodes.

Dr. Cerra observed that Plaintiff was "cooperative and pleasant, making rapport easy to

obtain. He remained focused on the completion of tasks. His dress was casual and appropriate .

. . . [H]e was oriented to time, place, person, and circumstance." (R. at 369.) IQ testing revealed

a verbal IQ score of 88, a performance IQ score of 70, and a full scale IQ score of 78. (R. at

371.) Dr. Cerra noted that significant scatter on the verbal subtest could indicate difficulty with

social judgment and common sense and that the significant discrepancy between verbal and

performance functioning could indicate that Plaintiff may have developed skills requiring verbal

reasoning more than those involving visual motor coordination. WRAT-4 testing indicated that Plaintiff was able to read words at grade level 12.5. His sentence comprehension was at grade level 12.5; spelling was at grade level 12.9; and math computation skills were at grade level 7.4. (R. at 372.) Dr. Cerra noted that Plaintiff might have some difficulty retaining new information and applying learned information. (R. at 373.) Dr. Cerra diagnosed bipolar disorder, PTSD, anxiety disorder, and alcohol dependence. (R. at 374.) He assigned Plaintiff a current GAF score of 48. Dr. Cerra opined that Plaintiff was "currently experiencing severe symptoms of anxiety and depression." (*Id.*)

**D. Todd Finnerty, Psy. D. and John Waddell, Ph.D.**

State agency psychologist, Todd Finnerty, Psy. D., reviewed the record on July 3, 2007. (R. at 311-13.) Dr. Finnerty concluded that Plaintiff had moderate limitations in the ability to complete a normal work day and work week without interruptions from psychological symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact with the general public; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers; to maintain socially appropriate behavior; or to respond appropriately to changes in the work setting. (R. at 312.) He also found that Plaintiff was "capable of performing tasks in a low stress setting without strict time constraints in a position that does not require him to work directly with the general public." (R. at 313.) Dr. Finnerty reported that he gave weight to the consultative examiner report "except in stress tolerance which is not consistent with the evidence presented." (*Id.*) State agency psychologist John Waddell, Ph.D., reviewed the file on September 25, 2007, and affirmed Dr. Finnerty's assessment. (R. at 324.)

## V. THE ADMINISTRATIVE DECISION

On April 1, 2009, the ALJ issued his decision. (R. at 8-26.) The ALJ found that Plaintiff

had the following severe impairments: mood disorder with anxiety and depression; PTSD;

Baker's cyst on the right knee; and alcohol dependence. (R at 10.) He further found that

Plaintiff did not have an impairment or combination of impairments that met or medically

equaled one of the listed impairments. (R at 18.) The ALJ set forth Plaintiff's residual

functional capacity ("RFC") as follows:

> After careful consideration of the entire record, the undersigned finds that
> [Plaintiff] has the residual functional capacity to perform medium work as defined
> in 20 CFR 404.1567(c) and 416.967(c) except that he should never climb ladders,
> ropes, or scaffolds. He should avoid concentrated exposure to dust, fumes, and odors.
> [Plaintiff] would be limited to performing unskilled work involving no more than one
> to three step tasks. He should have no direct contact with the general public, and
> would be limited to working with small groups of co-workers and supervisors.
> [Plaintiff] would be unable to perform work requiring a fast production pace or strict
> time constraints.

(R at 14.) Relying on the VE's testimony, the ALJ concluded that Plaintiff was unable to

perform any of his past relevant work as a lathe operator; dowel maker; banded coils;

aide/support coordinator/supervisor for social service agency; wood shop worker; muffler

installer; forklift operator and convenience store cashier, but that he could perform jobs that exist

in significant numbers in the national economy. (R. at 24-25.) He therefore found that Plaintiff

was not disabled. (R. at 26.)

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII.    ANALYSIS

Plaintiff advances three arguments in support of his assertion that the Court should reverse the Commissioner's decision. First, Plaintiff contends that the ALJ erred by not giving

sufficient weight to his treating medical sources. Second, Plaintiff asserts that the ALJ erred in

failing to properly evaluate the evidence in support of Plaintiff's claim. Finally, Plaintiff

maintains that the ALJ's hypothetical questions to the vocational expert did not accurately

portray Plaintiff's mental impairments. This Report and Recommendation addresses each

argument separately.

**A.      Weight Assigned to Ms. Huggins' and Dr. Andronic's Opinions**

Plaintiff asserts that the ALJ erred in rejecting Ms. Huggins' and Dr. Andronic's opinions

and in failing to provide good reasons for rejecting their opinions. The undersigned disagrees.

The ALJ must consider all medical opinions that he or she receives in evaluating a

claimant's case. 20 C.F.R. § 416.927(d). The applicable regulations define medical opinions as

"statements from physicians . . . that reflect judgments about the nature and severity of your

impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite

impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are

likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a

patient's] medical impairment(s) and may bring a unique perspective to the medical evidence

that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R.

§ 416.927(d)(2); *Blakley*, 581 F.3d at 408. If the treating physician's opinion is "well-supported

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent

with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling

weight." 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ

must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec*, 378 F.3d 541, 544

(6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling

weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment
> relationship and the frequency of examination, the nature and extent of the
> treatment relationship, supportability of the opinion, consistency of the opinion
> with the record as a whole, and the specialization of the treating source—in
> determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of

determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20

C.F.R. § 416.927(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make

clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889,

2010 WL 1725066, at *7 (6th Cir. Apr. 28, 2010) (internal quotation omitted). The United

States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason

requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the
> disposition of their cases," particularly in situations where a claimant knows that
> his physician has deemed him disabled and therefore "might be especially
> bewildered when told by an administrative bureaucracy that she is not, unless
> some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128,
> 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating
> physician rule and permits meaningful review of the ALJ's application of the rule.
> *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(e). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

### 1.    Dr. Andronic

In the instant case, the undersigned agrees that Dr. Andronic is Plaintiff's treating source. Dr. Andronic offered no opinions as to Plaintiff's workplace restrictions. She did however, offer diagnoses, assign Plaintiff a GAF score of 40, and noted that Plaintiff's symptoms escalated with alcohol abuse. (*See* R. at 341 (noting "substance induced mood disorder [and] depression"); R. at 339 (Plaintiff reported difficulty controlling his temper when drinking)). The ALJ's conclusion that Plaintiff has the severe impairments of mood disorder with anxiety and depression, post-traumatic stress disorder, and alcohol dependance is consistent with Dr. Andronic's diagnoses. (*See* R. 341.) The ALJ considered, but rejected Dr. Andronic's assignment of a GAF score of 40 on October 30, 2007, explaining that Plaintiff "was reporting a lot of alcohol use at the time, and he stated that he had increased fighting while drinking. Therefore, it appears that this score may have largely been related to the claimant's alcohol use at the time." (R. at 23.)

The ALJ did not err in rejecting Dr. Andronic's assignment of a GAF score.

A GAF score represents a "snapshot" of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 F. App'x 191, 194 n. 2 (6th Cir. 2003); *see also* DSM-IV-TR at 32–34. "As such, a GAF assessment is isolated to a relatively brief period of time, rather than being significantly probative of a person's ability to perform mental work activities on a full-time basis." *Arnold v. Astrue*, No. 10-cv-13, 2010 WL 5812957, at *8 (S.D. Ohio Oct. 7, 2010). For this reason, the ALJ's decision not to credit Dr. Andronic's October 2007 GAF score in formulating Plaintiff's RFC is appropriate given the ALJ's finding that Plaintiff's was no longer abusing alcohol as he had been in October 2007. Further, "the Commissioner has declined to endorse the GAF score for use in the Social Security and SSI disability programs, and has indicated that GAF scores have no direct correlation to the severity requirements of the mental disorders listings." *Kennedy v. Astrue,* 247 F. App'x 761, 766 (6th Cir. 2007) (internal quotation marks and citations omitted).

### 2. Ms. Huggins

The undersigned likewise concludes that the ALJ did not err in discrediting Ms. Huggins' opinions. Contrary to Plaintiff's assertion, Ms. Huggins, a licensed social worker, does not qualify as a treating source. "The agency's regulations limit treating sources to 'acceptable medical sources,' 20 C.F.R. § 404.1502, the definition of which does not include mental health counselors . . . ." 20 C.F.R. § 404.1513(a). *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011). Thus, Ms. Huggins' opinions are not entitled to any particular weight. *See* 20 C.F.R. §§ 404.1513(a), (d), 416.913(a), (d). Ms. Huggins is, however, a valid "other source" whose opinion is entitled to consideration due to her expertise and treatment relationship with Plaintiff. *See* 20 C.F.R. § 404.1513(d)(1).

The ALJ extensively reviewed Ms. Huggins' treatment notes and considered her functionality opinion, but declined to give it great weight, explaining as follows:

> The undersigned notes that Ms. Huggins did not state what [Plaintiff's] limitations would be absent his substance abuse. Further, the objective record does not support some of the marked limitations that she imposed on [Plaintiff]. While Ms. Huggins found that [Plaintiff] was markedly limited in his ability to maintain attention and concentration for extended periods, there have been no findings on examination that indicate that [Plaintiff] is that significantly limited in his ability to maintain concentration and focus. He was able to concentrate and focus well during testing performed by Dr. Cerra. In regard to Ms. Huggins' finding that [Plaintiff] has marked limitations socially, the preponderance of the evidence indicates that when [Plaintiff] is not drinking, he is able to maintain social interaction with friends and family. There is no indication in the record that [Plaintiff] has any difficulty with using transportation or traveling in unfamiliar places or that he is unable to adhere to basic standards of cleanliness and neatness, at least when he is not drinking.

> *       *       *

> While Ms. Huggins found that [Plaintiff] was markedly limited in many areas of functioning, the undersigned notes that [Plaintiff] was less than fully compliant with his medication for no good reason and continuing to drink. The objective medical evidence indicates that when he is medicated and not drinking, [Plaintiff's] mood and temper are more stable. In any event, the preponderance of the evidence does not support Ms. Huggins' opinion that the claimant is markedly limited in areas such as maintaining regular attendance; maintaining attention and concentration for extended periods; asking simple questions or requesting assistance; maintaining socially appropriate behavior; and traveling in unfamiliar places or using public transportation.

(R. at 17, 23.)

The undersigned finds that the ALJ provided good reasons for rejecting Ms. Huggins' opinions and that substantial evidence supports the ALJ's stated reasons. Accordingly, the undersigned concludes that the ALJ's failure to assign greater weight to Ms. Huggins' opinions does not constitute reversible error.

**B.      The ALJ's Evaluation of the Evidence**

Plaintiff next challenges the ALJ's evaluation and weighing of evidence from other sources. Specifically, Plaintiff challenges the ALJ's rejection of consulting psychologist David Bousquet's opinion that Plaintiff has a marked impairment in dealing with work-place stress and his rejection of the GAF score assigned by consulting psychologist Dr. Cerra.

The undersigned concludes that the ALJ did not err in his consideration of Mr. Bousquet's opinion.[4] Aside from opining that Plaintiff's ability to handle work-related stress was markedly limited, Mr. Bousquet concluded that Plaintiff was not impaired, only mildly impaired, or moderately impaired in his ability to manage various workplace functions. The ALJ only disagreed with Mr. Bousquet's finding of marked limitation in dealing with stress. He explained as follows:

> [Mr. Bousquet's] opinion that [Plaintiff] would be markedly limited in his ability to deal with the stress and pressures associated with day to day work is not fully supported by the preponderance of the evidence. [Mr. Bousquet] indicated that such stresses would cause [Plaintiff] to increase his use of substances, but the evidence indicates that the claimant is able to deal with low stress work. The claimant's work history shows that he was able to deal with normal work stress prior to increasing his drug and alcohol use. He is able to control his use of alcohol and marijuana when he so desires.

(R. at 23.) Substantial evidence supports the ALJ's evaluation of Mr. Bousquet's opinion. His evaluation is in accord with the evaluations of state-agency psychologists Drs. Finnerty and Waddell. Dr. Finnerty gave weight to Mr. Bousquet's evaluation "except in stress tolerance which is not consistent with the evidence presented." (R. at 313.) Further, Mr. Bousquet did not have the benefit of Plaintiff's testimony concerning is ability to control his alcohol intake or his work history.

---

[4]Although the ALJ discusses an evaluation by "Dr. Rain," he appears to be discussing Mr. Bousquet's evaluation. (*See* R. at 14–15, 23.)

The undersigned also concludes that the ALJ did not err in his evaluation of Dr. Cerra's GAF score assignment. The ALJ noted that Dr. Cerra's GAF score of 48 was not consistent with his actual findings. The ALJ explained as follows:

> [Dr. Cerra] noted that [Plaintiff] was cooperative, pleasant, and focused on the completion of tasks. His anxiety level was not significantly elevated, and his memory, attention, and concentration were in tact. The GAF given by Dr. Cerra appears to be based on [Plaintiff's] self-report symptoms, and the undersigned has not given this significant weight.

(R. at 23.) Substantial evidence supports the ALJ's reasons for not crediting Dr. Cerra's GAF score. Regardless, as set forth above, the Commissioner has not endorsed the GAF score such that an ALJ is required to consider the score in formulating his RFC. *See Kennedy*, 247 F. App'x at 766.

## C.     Reliance on the Vocational Expert's Testimony

Finally, Plaintiff contests the validity of the hypothetical question posed to the VE, which elicited testimony to the effect that Plaintiff retained sufficient residual capacity to perform a significant number of jobs. "In order for a VE's testimony to constitute substantial evidence that a significant number of jobs exists, the questions must accurately portray a claimant's physical and mental impairments." *Cole*, 661 F.3d at 939. Plaintiff contends that the ALJ erroneously failed to include a limitation regarding his "diminished ability . . . to complete a normal work day and work week without interruptions from psychologically based symptoms and to work at a consistent pace without an unreasonable number of rest periods." (Pl.'s Stmt. of Errors 15, ECF No. 16.)

The undersigned finds that the ALJ's hypothetical question incorporated all of the limitations the ALJ found credible and supported by the evidence and, therefore, was proper. In

formulating the hypothetical, an ALJ is only "required to incorporate those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). Here, the ALJ concluded that Plaintiff was limited to unskilled work involving no more than one-to-three-step tasks; no direct contact with the general public; working with only small groups of co-works and supervisors; and no work requiring fast production pace or strict time constraints. (*See* R. at 21.) The ALJ did not find Mr. Bousquet's and Mrs. Huggins' conclusions about marked limitations in other areas credible. Plaintiff fails to identify other evidence supporting additional RFC restrictions that the ALJ found credible. Accordingly, the ALJ did not err in relying on the VE's testimony.

## VIII.   CONCLUSION

From a review of the record as a whole, the undersigned concludes that there is substantial evidence supporting the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner of Social Security's decision be **AFFIRMED**.

## IX.   PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date:  February 13, 2012                    /s/ *Elizabeth A. Preston Deavers*
                                        Elizabeth A. Preston Deavers
                                        United States Magistrate Judge